## IN THE FEDERAL DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

HR Properties of Delaware LLC, and )
The Royal Trust of New Orleans )
                                )
Plaintiffs, )
                                )    No. _____
           v.                 )
                                )
Adams and Reese LLP, Basin Street Studios )
LLC, Pelican Loop Development Co. LLC, )
John Doe/Broker Dealer )
Green Coast Enterprises, LLC, )
 Ron Nakamoto, Robin B. Cheatham, )
Lisa M. Hedrick, Alexander S. Kelso, )
 William Bradshaw II, and James Davidson )
                                )
Defendants. )

### COMPLAINT

Plaintiffs HR Properties of Delaware LLC ("HR") and The Royal Trust of New Orleans (the "Royal Trust"), on behalf of themselves, Basin Street Development Company, LLC ("Development Company") and Storyville Studios, LLC ("Storyville"), for their complaint against Adams and Reese LLP ("AR"), Basin Street Studios LLC ("BSS"), Pelican Loop Development Co., LLC ("Pelican"), John Doe/Broker Dealer, Green Coast Enterprises, LLC ("Green Coast"), Robin B. Cheatham ("Cheatham"), Lisa M. Hedrick ("Hedrick"), Ronald H. Nakamoto "(Nakamoto"), Alexander S. Kelso ("Kelso"), William Bradshaw II ("Bradshaw") and James Davidson ("Davidson"), state as follows:

### Nature of the Lawsuit

1.        Plaintiffs bring this civil complaint for treble damages against all Defendants arising from the Defendants' violation of the Racketeer Influenced and Corrupt

Organizations statute, 18 U.S.C. 1961-1968 et seq. ("RICO") (against all Defendants), declaratory judgment/unjust enrichment (against all Defendants), common law fraud (against all Defendants), civil conspiracy (against all Defendants), legal malpractice (against Cheatham, Hedrick and AR), breach of fiduciary duty (against Pelican and Nakamoto, and against AR, Cheatham, and Hedrick), and breach of contract (against AR, Cheatham, and Hedrick, and against Green Coast, Bradshaw and Kelso).

2.        Plaintiffs bring this suit because they were damaged by a fraudulent scheme of the Defendants, and other acts and omissions of Defendants set forth in the following causes of action.

3.        Defendants' scheme involved, inter alia, using the U.S. mail, electronic communications, including email and facsimile, and oral misrepresentations to fraudulently obtain the approval of a business reorganization plan in bankruptcy effecting the transfer of property owned by BS2LP to BSS.

4.        The primary purpose of Defendants' scheme was to circumvent a contract for the sale of Plaintiffs' interest in BS2LP and the property for $1.2 million, and to seize Plaintiffs' business opportunity to further develop that property.

5.        Plaintiffs were damaged by Defendants scheme in that, among other things, the Defendants' fraudulent actions led to the loss of Plaintiffs' interest in the properties owned by BS2LP, and the business opportunity to develop those properties.

**Factual and Jurisdictional Background**

6.        HR is a limited liability company organized under the laws of the State of Delaware, with offices in Cook County, Illinois.  Its co-managers are John B. Ohle III  ("John Ohle") and Scott Deichmann ("Deichmann").

2

7.    The Royal Trust is a trust organized under the laws of the state of Louisiana, with an address at 1940 Chestnut Avenue, Wilmette, Illinois 60091.

8.    Patricia Dalton Ohle (Patricia Ohle) is trustee of the Royal Trust, and the spouse of John Ohle.

9.    On information and belief, AR is a limited liability partnership organized under the laws of the state of Louisiana.

10.    AR has an office at One Shell Square, 701 Poydras Street, Suite 4500, New Orleans, Louisiana 70139, and maintains offices in various cities in Alabama, Mississippi, Texas, Tennessee and Washington, DC..

11.    On information and belief, BSS is a limited liability company organized under the laws of the state of Louisiana, with an address at 828 Royal Street #282, Louisiana 70112.

12.    On information and belief, Pelican is a limited liability company organized under the laws of the state of Delaware, with an address at 828 Royal Street #282, Louisiana 70112.

13.    On information and belief, Pelican and/or Nakamoto have an ownership interest in BSS.

14.    On information and belief, John Doe/Broker Dealer is a company organized under the laws of a state of state of the United States, with a presently unknown address.

15.    On information and belief, Nakamoto and Davidson are affiliated with John Doe/Broker Dealer as their broker for financial and securities services.

16.    On information and belief, Green Coast Enterprises, LLC is a limited liability company organized under the laws of the state of Louisiana, with an address at 4164 Canal Street, New Orleans, Louisiana 70119.

17. Cheatham is an individual residing at 360 Jefferson Ave., Metairie, Louisiana 70005, Louisiana.

18. At all material times hereto, Cheatham was an attorney and partner at AR.

19. Hedrick is an individual residing at 309 Dorrington Blvd., Metairie, Louisiana 70005

20. At all material times hereto, Hedrick was an attorney at AR.

21. AR, Cheatham, and Hedrick and are referred to herein as the "AR Defendants".

22. On information and belief, Nakamoto is an individual last known to reside at 500 North Claiborne Avenue New Orleans, LA 70112, with an office at 837 Royal St., #K, New Orleans, LA 70116.

23. On information and belief, Nakamoto was and is the manager of BSS.

24. On information and belief, Nakamoto was and is the principal owner of Pelican.

25. On information and belief, Alexender Kelso is an individual residing at or with an office at 842 Washington Avenue, New Orleans, Louisiana, 70130.

26. On information and belief, William Bradshaw is an individual residing at or with an office at 4164 Canal Street, New Orleans, Louisiana 70119.

27. Kelso, Bradshaw and Green Coast are referred to herein as the "Green Coast Defendants".

28. On information and belief, Jim Davidson is an individual residing at, or with an office at 10681 Foothill Blvd. Rancho Cucamonga, CA 91730.

29. At all material times hereto, and beginning in at least the summer 2006, and continuing through the present, the Defendants regularly entered into contracts with and conducted business with citizens of and entities formed and/or doing business in the state of

Illinois, caused tortuous injury within the state of Illinois by their acts and omissions, regularly solicited business and negotiated and entered contracts within the state of Illinois, and derived substantial revenue from services, business contacts and/or contracts with citizens of and entities formed and/or doing business in the state of Illinois.

### Jurisdiction and Venue

30.     This court has jurisdiction over this civil action pursuant to 18 U.S.C. ¶¶1964(a) and 1964(c), and 28 U.S.C. ¶¶1331 and 1337.  This is a civil action arising under 18 ¶¶ 1961-1968, ¶901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("Rico"), and in particular, under 18 U.S.C. ¶1964 and other causes of action as set forth hereafter. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. ¶1367.

31.     Venue lies in this District pursuant to 18 U.S.C. ¶1965 and 28 U.S.C. ¶1391.  As set forth herein, Defendants at all material times conducted substantial business within this district.  The violations occurred at least in part in this District.  Defendants transact or have transacted their affairs in this district, negotiated and entered contracts in this district, and their concerted conduct, upon which this action is based, was directed at and intended to hurt Plaintiffs in this district.

32.     Defendants, either on their own or through their agents, at the time of the commission of the acts alleged hereunder, were found in and/or transacted business in the state of Illinois, and the cause of action which is the object of this Complaint arises out of business transactions in the state of Illinois, including specific acts within this district.

33.     Plaintiffs allege claims under RICO, as well as under state law for declaratory judgment/unjust enrichment, common law fraud, civil conspiracy, legal malpractice, breach of

fiduciary duty, and breach of contract.  Plaintiffs seek, among other things, disgorgement of the fees paid to AR, compensation for all damages sustained, including without limitation money contributed to BS2LP and the development of the Winn Dixie Property, loss of business funding incentives including federal, state and local incentives, the value of Plaintiffs' interest in BS2LP and/or property owned by BS2LP, and other damages, which damages must be trebled under RICO.  Plaintiffs also seek all attorneys' fees and costs for this action under RICO.

### *The Underlying Transactions and Changes in Ownership*

34.     BS2LP was formed effective March 1, 2001 for the purpose of acquiring, holding for investment, managing, operating, leasing, mortgaging, selling, exchanging, or otherwise disposing of immovable and real property, including certain property located on Basin Street in New Orleans, Louisiana (the "Basin Street Properties").

35.     Two parcels of property owned by BS2LP included parcels commonly described as Winn Dixie ("the Winn Dixie Property") and the French Quarter RV park ("FQRV Property") held by FQRV LLC n/k/a FQRV Management, L.L.C., a wholly owned limited liability company of BS2LP.

36.     BS2LP's general partner, Bauer & Company, Inc. ("Bauer"), owned a 55% interest in the partnership.

37.     Southern Dealers Mechanical Insurance Company, Heidingsfelder Investment Trust, and Troy Thompson III, cumulatively owned the remaining 45% interest as limited partners.

38.     On or about August 16, 2006, AR was retained by HR to draft and negotiate an Option Agreement for BS2LP interests.  A true and accurate copy of the Engagement Agreement is attached hereto as Ex. 1.

39.     The Engagement Agreement is addressed to Messrs. Ohle and Deichmann at a Chicago, Illinois address, 541 North Fairbanks Court, Chicago, Illinois 60611.

40.     In the course of preparing the Option Agreement, multiple drafts of the agreement and other correspondence were sent to John Ohle and Deichmann at their Chicago, Illinois offices.

41.     The Option Agreement provided, in pertinent part, an option to HR "and its successors and assigns the right and option to purchase each, of the GRANTORS' [limited partners] entire limited partnership interest in the PARTNERSHIP."

42.     On or about November 30, 2006, AR and HR signed a waiver of conflict allowing AR to be retained by BS2LP to file for bankruptcy protection. A true and accurate copy of the Waiver Letter is attached hereto as Ex. 2.

43.     The waiver letter was addressed to Messrs. Ohle and Deichmann at HR's Chicago, Illinois address.

44.     On or about November 30, 2006 , a petition for bankruptcy was filed on behalf of BS2LP (the "BS2LP Bankruptcy").

45.     In connection with the BS2LP Bankruptcy, on or about January 9, 2007, AR filed an Application to Approve Employment of Counsel for the Debtor (BS2LP).

46.     Pursuant to that filing AR disclosed and filed a copy of the Option Agreement but did not disclose that it also represented HR, as well as the debtor BS2LP.

47.     Due to the pending bankruptcy, AR recommended to HR and Bauer an outright transfer of BS2LP in lieu of the Option Agreement.

48.     On or about April 2, 2007, based upon advice from AR, Baur transferred 23.375% of its interest in BS2LP to Development Company.

49.     On information and belief, AR drafted the legal instruments necessary for this transaction.

50.     JSJD Development Company, LLC ("JSJD") was the manager of Development Company.

51.     The co-managers of JSJD were John Ohle and Deichmann.

52.     In or around May 2007, again based on advice from AR, and with AR's participation in drafting, the BS2LP partners entered into a Second Amended and Restated Partnership Agreement, reflecting the new ownership structure. A true and accurate copy of the Second Amended and Restated Partnership Agreement (the "2nd Partnership Agreement"), is attached hereto as Ex. 3.

53.     In connection with the Bankruptcy of BS2LP, Development Company paid at least $100,000 in bankruptcy fees to AR, and also paid approximately $1.3 million toward BS2LP's operating expenses and development costs.

54.     In order to continue the development efforts of the Winn Dixie Property and to fund the reorganization of BS2LP, Bauer sought funding. Nakamoto solicited clients of John Doe/Broker Dealer and arranged for those clients to make a series of loans to Bauer.

55.     On information and belief, AR drafted the notes and security agreements to affect the above described loan transactions.

56.     In or about May 2007, based on advice and drafting of documents by AR, Bauer and HR established a new structure to facilitate the purchase of the Winn Dixie Property from BS2LP in the bankruptcy proceeding.

57.     On or about May 15, 2007, Nouveau Carre, LLC was formed to purchase the Winn Dixie Property land from BS2LP.

58.     Four development subsidiaries, Carnival Hospitality, LLC, French Quarter Services, LLC, NOLA xStay, LLC and Basin Street Management, LLC, were organized to develop the Winn Dixie Property and to apply for various governmental incentives and programs, including Gulf Opportunity Zone Act bonds.

59.     Following the capital market collapse in Fall 2008, and again based on advice from AR and drafting of documents by AR, Bauer agreed to transfer its general partnership interest in BS2LP in lieu of repaying the loans to John Doe/Broker Dealer clients.

60.     On or about December 31, 2008, based upon advice from AR, Bauer transferred its 31.625% general partnership interest in BS2LP to Rebirth Management Company, LLC ("Rebirth") in lieu of foreclosure by John Doe/Broker Dealer clients.

61.     On information and belief, AR drafted the legal instruments to effect this transaction.

62.     AR, however, failed to have the limited partners in BS2LP approve the transfer to Rebirth in contravention of the 2nd Partnership Agreement, which precluded transfers of partnership interests without first offering the interest to other partners and obtaining approval of the partners for the transfer.

63.     AR's failure to obtain the required approvals resulted in litigation in the bankruptcy proceeding throughout 2009, which jeopardized BS2LP's existence, and resulted in large legal fees billed to BS2LP.

64.     On information and belief, on or around September 29, 2009, the original limited partners of BS2LP, Southern Dealers Mechanical Insurance Company, Heidingsfelder Investment Trust and Troy Thompson III, and Rebirth agreed to a compromise that allowed Rebirth to continue as Acting General Partner, and to buy out the original limited partners.

65.    In or about October 2009, based on the advice of AR, HR, the Royal Trust and Development Company reached an agreement with Nakamoto and Rebirth that called for all BS2LP interests owned by any of the entities to be transferred to San Francisco Financial Partners of Louisiana LLC "San Fran LLC"), which was to be owned equally by the Royal Trust and Pelican.

66.    Subsequent to September 29, 2009, HR and the Royal Trust transferred Development Company's 23.375% limited partnership interest to San Fran LLC and then transferred Development Company to San Fran LLC in return for a 50% membership interest in San Fran LLC.

67.    On information and belief, the transfer described in the preceding paragraph occurred between September 30, 2009 and December 3, 2009.

68.    Subsequent to September 29, 2009, Pelican Loop transferred Rebirth, which held a 31.625% partnership interest in BS2LP, to San Fran LLC in return for a 50% membership interest in San Fran LLC.

69.    On information and belief the transfer described above in the preceding paragraph also occurred between September 30, 2009 and December 3, 2009.

70.    In or about December 2009, again based on advice from AR, and with AR's drafting, the BS2LP partners entered into a Third Restated Partnership Agreement, reflecting the latest ownership structure.   A true and accurate copy of the Third Amended and Restated Partnership Agreement (the "3rd Partnership Agreement) is attached hereto as Exhibit 4 .

### The Defendants' Fraud

71.    On or about February 2, 2010, based on the advice of AR, Pelican and the Royal Trust organized Storyville Studios, LLC to purchase the Winn Dixie Property from BS2LP.

72.     Storyville was organized to purchase, develop and operate the Winn Dixie Property as an entertainment production facility.

73.     Pelican and the Royal Trust each owned 50% membership interests in Storyville.

74.     On or about May 24, 2010, the Bankruptcy Court authorized Storyville to purchase the Winn Dixie Property from BS2LP.

75.     AR was to draft new mortgage documents, consistent with the Bankruptcy Court's Order, with the attorney for National Western Life Insurance Company, the lender on the Winn Dixie Property.

76.     AR never delivered the mortgage documentation to Storyville despite numerous requests that it do so.

77.     Subsequent to the Bankruptcy Court's Order authorizing the sale of the Winn Dixie Property to Storyville, Nakamoto through his entity, Pelican, negotiated to buy the Royal Trust's interest in Storyville, including its right to purchase the Winn Dixie Property.

78.     On or about August 31, 2010, based on the advice of AR, the Royal Trust and Pelican negotiated an LLC Member Interest Purchase Agreement, by which Pelican was to purchase all of Royal Trust's interest in Storyville for the sum of $600,000.

79.     AR provided advice and counsel for this transaction and agreed to serve as Escrow Agent for the transaction.

80.     All documents related to the transaction were negotiated and delivered to the Royal Trust in Illinois.

81.     Instead of completing the transaction as previously negotiated, Nakamoto instead asked the Royal Trust to enter into a transaction to sell all of its interests in Storyville and San Fran LLC to Green Coast.

82. The Royal Trust and/or its representatives communicated with AR stating that Nakamoto had not consummated the proposed buy out of Royal Trust so the reorganization of BS2LP in bankruptcy should proceed, based upon the Royal Trust as a continuing member.

83. AR repeatedly corresponded by telephone, mail and electronically with the Royal Trust and its representatives in Illinois through September 2010 regarding the drafting and finalization of a modified Plan of Reorganization in the bankruptcy.

84. Prior to filing the Sixth Amended Plan of Reorganization as modified as of October 1, 2010, AR sent a copy of the amended Plan of Reorganization to the Royal Trust and its representatives in Illinois.

85. The Sixth Amended Plan of Reorganization as modified as of October 1, 2010 (the "October 2010 Amended Plan") that was filed with the Bankruptcy Court stated that Storyville would buy the Winn Dixie Property. A true and accurate copy of the October 2010 Amended Plan, without its exhibits is attached hereto as Exhibit 5.

86. On or about November 10, 2010, Nakamoto, on behalf of BS2LP and Storyville, required William Bradshaw, on behalf of Green Coast, to sign a Confidentiality, Non-Disclosure and Non-Circumvention agreement. A true and accurate copy of the Confidentiality Non-Disclosure, Non-Circumvention agreement (the "Non-Circumvention Agreement") is attached hereto and incorporated by reference as Exhibit 6.

87. On information and belief the Non-Circumvention Agreement was drafted by AR.

88. The Non-Circumvention Agreement stated:

Each Party specifically warrants, for itself, and for its agents…representatives…successors and assigns, that it shall not (1) circumvent this agreement either directly or indirectly through its agreement or association with a third party not subject to this Agreement, (2) purchase or cause to be purchased, the Property or any portion thereof except through and/or from Storyville Studios, LLC and (3) communicate, either directly or indirectly through its agreement or association with a

third party not subject to this agreement, regarding the Transaction with any of the parties with whom either party discloses it is negotiating and/or mentions as potential tenants, investors, or equity partners.

89.     The Non-Circumvention Agreement defined the "Property" to be the Winn Dixie Property, and the "Transaction" to be "the transaction that Storyville is currently negotiating with third parties regarding the Property…"

90.     On or about November 23, 2010, Green Coast executed a letter of intent (the "LOI") with the Royal Trust to purchase the Royal Trust's interests in Rebirth and San Fran LLC (the "Interests").    A true and accurate copy of the letter of intent is attached hereto and incorporated by reference as Exhibit 7.

91.     The LOI stated, in pertinent part:

We would like to proceed with this deal.  Upon your agreement to the terms outlined in this letter, we will take the following immediate steps:
(1) We will deposit $200,000 with our attorney to be held in Trust for you.
(2) We will instruct our attorney to prepare and send you a purchase and sale agreement applicable to the Interests.  The purchase and sale agreement will provide that we will complete the purchase of the interests when we close on the financing for the Property, but no later than May 30, 2011.  The $200,000 deposit will be applied to the purchase [sic] $1.2 million purchase price.  If we cannot complete that closing by that date, you will keep the $200,000 as a forfeited deposit.

92.     The Royal Trust, Pelican, San Fran LLC and Rebirth delivered all items of due diligence to Green Coast pursuant to their requests.

93.     In connection with that due diligence Green Coast was informed of John Ohle's criminal conviction.

94.     Between October 1 and December 22, 2010, the Royal Trust and/or its representatives repeatedly communicated with AR concerning the October Amended Plan, requesting an update on status for the plan, which was scheduled for a hearing on December 22, 2010.

95.     Unknown to Plaintiffs, prior to that hearing, AR communicated and conspired with Nakamoto, Green Coast, through its representatives Kelso and Bradshaw, John Doe/Broker Dealer, through its agents Nakamoto and Davidson, and BSS to substitute BSS for Storyville on the day of the hearing without notice or explanation to Storyville, or the Plaintiffs.

96.     On December 22, 2010, AR submitted what it described as an "immaterial modification" to the Sixth Amended Plan substituting BSS for Storyville in the plan for reorganization (the "December Amended Plan").  A true and accurate copy of the December Amended Plan, without its exhibits, is attached hereto as Exhibit 8.

97.     Defendants conspired to submit this purported "immaterial modification" to cut the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

98.     At the bankruptcy court hearing on December 22, 2010, Nakamoto made false representations to the Court that Storyville could not obtain financing from investors to purchase the Winn Dixie Property because investors refused to invest in Storyville in light of Ohle's criminal conviction and indirect involvement in Storyville.

99.     The December Sixth Amended Plan was further based on the submission to the Bankruptcy Court of a credit facility agreement (the "CRA") from CRI, upon which BSS's purported ability to purchase the Winn Dixie Property was predicated.

100.    On information and belief, CRI is a statutory trust, organized under the laws of the state of Delaware.

101.    On information and belief, the CRA was fraudulent, and was never intended to serve as a source of funding for BSS.

102.    John Doe/Broker Dealer through its agent Davidson, solicited CRI to provide the CRA, purportedly to fund BSS.

103.    Nakamoto represented to the Bankruptcy Court that CRI was ready, willing and able to provide the funding called for by the credit facility agreement.

104.    Nakamoto further falsely represented to the court that he was the sole member of BSS because investors had been unwilling to invest in Storyville because of John Ohle's criminal conviction.

105.    Notwithstanding Nakamoto's representations to the Court that he was the sole member of BSS because of investors' purported reluctance to participate in any transaction involving John Ohle, Nakamoto and the other Defendants intended that members of Kelso's family would ultimately have an ownership interest in BSS.

106.    At the time Nakamoto made that representation to the court, he and the other Defendants knew that Green Coast, Kelso and Bradshaw, were aware of John Ohle's criminal conviction, and had not objected to proceeding with investing in the Winn Dixie Property on that basis.

107.    Nakamoto further knew that the Green Coast Defendants could not be involved in any transaction involving the purchase of the Winn Dixie property by any entity other than Storyville without violating the Non-Circumvention Agreement.

108.    Attached as Exhibit 9 is a true and accurate copy of what appears to be a BSS marketing document from February 2011, indicating that that BSS was owned by "Ron Nakamoto and the family of Alexender Kelso."

109.    On information and belief, as of the instant date, CRI has not provided funding to BSS pursuant to the CRA, and the sale of the Winn Dixie Property to BSS has not been completed.

## FIRST CAUSE OF ACTION:
### Violations of RICO

### (Against all Defendants)

110.    The allegations contained in paragraphs 1 through 109 of this Complaint are incorporated herein by reference.

111.    Each Plaintiffs is a person within the meaning of 18 U.S.C. ¶1964 (c).

### The Enterprise

112.    At all times relevant hereto Plaintiffs and each member of the Enterprise was a person within the meaning of 18 U.S.C. ¶1961 (3).

113.    An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

114.    The enterprise at issue in this case, for purposes of 18 U.S.C. ¶¶1961(3) and 1962(a), 1962(b), 1962(c) and 1962(d), is an association-in-fact- of all unnamed co-conspirators and Defendants – "Members of the Enterprise" – collectively referred to herein as "the Enterprise." The wrongdoers that were part of the association-in-fact Enterprise include the Defendants and unnamed co-conspirators such as CRI.

115.    While Defendants participated in the Enterprise and were a part of it, Defendants also have an existence separate and distinct from the Enterprise.

116.    Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

117.     Defendants control and participation in the Enterprise were necessary for the successful operation of the Defendants' scheme.

118.     The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

119.     Defendants and all other members of the Enterprise shared costs, information, resources, and the fruits of its predicate acts.  The association-in-fact Enterprise, composed of Defendants and other Members of the Enterprise, was a formal, ongoing relationship which functioned as a continuing unit, pursuing a course of conduct as set forth above (i.e. the pursuit of the Winn Dixie Property and the opportunity to develop that property that belonged to the Royal Trust and Storyville) with a common or shared purpose (i.e. to obtain financial benefit from seizing the opportunity to develop the Winn Dixie Property that belonged to the Royal Trust and Storyville) and continuity of structure and personnel (including partners, associates, and support staff).

120.     Defendants and those employed by and/or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of  18 U.S.C. ¶¶1962 (a) and (b), and have conspired to violate ¶1962 (c) in violation of ¶1962 (d) by cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR, and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

121.     Defendants have violated 18 U.S.C. ¶1962 (d), in as much as they knowingly, intentionally, and unlawfully, aided and abetted each other and the Enterprise and conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

**The Scheme**

122.     As set forth hereinabove, for a substantial period of time, Members of the Enterprise knowingly, intentionally and directly participated in, or aided and abetted, counseled, commanded, induced, procured or caused and conspired in the pursuit of cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

123.     The particulars of the scheme as set forth above were achieved by means of false or fraudulent representations or promises and through the use of the mails and/or wires.

**Predicate Acts**

124.     With respect to the activities alleged herein, the Enterprise acted at all times with malice toward the Plaintiffs, with the intent to engage in the conduct complained of for the monetary benefit of Defendants and other Members of the Enterprise. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs. The predicate acts were acts of deception which furthered the goal of cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements,

to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

125.    With respect to the activities alleged herein, the Enterprise sought to aid and abet and actually did aid and abet a transaction to violate 18 U.S.C. §§1962(a), (b) and (c). Each Member of the Enterprise, including Defendants, agreed to interfere with, obstruct, delay or affect interstate commerce by cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

126.    With respect to the overt acts and activities alleged herein, each Member of the Enterprise conspired with each other co-conspirator entity or to violate 18 U,S.C. §§1962(a), (b) and (c), all in violation of 18 U.S.C. §1962(d).

127.    In violation of §1962(c), each Member of the Enterprise agreed and conspired with each other Member to: a) pursuant to § 1962(a), to invest income obtained as a result of its racketeering activities and b) pursuant to § 1962(b), acquire or maintain property interests to which the Enterprise was not entitled through racketeering activity which included cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

128.    The Enterprise's schemes have resulted in severe financial and business losses to the Plaintiffs.

129.    Moreover, as a result of the Enterprise's wire fraud and mail fraud violations, Plaintiffs have suffered extensive monetary damages including but not limited to the loss of the $1.2 million sale contemplated by the LOI, as well as the loss of the Winn Dixie Property, the opportunity to develop that property, and funds invested in that property and BS2LP.

130.    The Enterprise's documents and communications associated with the schemes at issue contained false and/or misleading representations.

131.    These misrepresentations constitute "false or fraudulent pretenses, representations or promises" within the meaning of the mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) provisions.

132.    All of the Members of the Enterprise actively participated in this elaborate and abusive scheme to obtain money from Plaintiffs, including Defendants herein and others who are not named as Defendants to this matter.

133.    The numerous predicate acts of mail and wire fraud described herein are part of separate fraudulent transactions by the Enterprise designed to defraud the Plaintiffs of money and property interests under false pretenses.

134.    As the victim of these unlawful patterns of illegal behavior, Plaintiffs have continued to suffer losses.

135.    In carrying out the overt acts and fraudulent transactions described herein, the Enterprise engaged in conduct in violation of various state and federal laws and regulations, including but not limited to 18 U.S.C. §§1341, 1343, 1346 and 1961 *et seq.*

136.    18 U.S.C. 1961(1) provides that "racketeering activity means any act indictable

under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud), and §1346 (relating to scheme or artifice to defraud).

### Violations of 18 U.S.C. Sections 1341 and 1343

137.	For the purpose of executing and/or attempting to execute its transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories for mail, matter and things to be sent or delivered by the Postal Service and received matter and things therefrom including but not limited to contracts, instructions, correspondence, letters, checks and other items.

138.	For the purpose of executing and/or attempting to execute its transaction to defraud and obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things therefrom, including but not limited to contracts, instructions, correspondence, court filings, funds and other things.

139.	The Enterprise's use of the mails and wires includes private and public components.

140.	The Members of the Enterprise utilized the U.S. Mail and wire to communicate among themselves, as well as with their co-conspirators and clients. Many of the Defendants lived and /or worked in the State of Louisiana and participated in this scheme from there, while Plaintiffs were located in Illinois. In order to carry out and implement its scheme, the Enterprise necessarily had to communicate using the interstate mails and wires.

141.	In those matters and things sent or delivered by the Postal Service, by wire and through other interstate electronic media, the Enterprise falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs, in violation of 18 U.S.C. §§1341 and 1343.

142.	The Enterprise intentionally and knowingly made these misrepresentations and

intentionally and knowingly suppressed material facts from Plaintiffs for the purpose of deceiving them and thereby obtaining financial gain.

143.    The Enterprise either knew, should have known, or recklessly disregarded that the misrepresentations and omissions described herein were material.

144.    Plaintiffs justifiably relied on the misrepresentations and omissions.

145.    Plaintiffs have therefore been injured in its business or property by the Enterprise's overt acts and racketeering activities.

### Pattern of Racketeering Activity

146.    The violations set forth herein constitute "racketeering activities" or "predicate acts" within the meaning of 18 U.S.C. § 1961(1).

147.    The Enterprise has engaged in a "pattern of racketeering activity," as defined in §1961 of RICO, by committing and/or conspiring to commit or aiding and abetting a transaction with at least two such acts of racketeering activity, as described specifically herein, within the past ten years. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results on the Plaintiffs herein.

148.    The Enterprise's racketeering activities or predicate acts are related and also amount to a continuous criminal activity.

149.    These predicate acts are related in the sense that they have the same purpose (to carry out the scheme described herein); result (to obtain money); victims (such as Plaintiffs herein) method of commission (the scheme described herein); and are otherwise interrelated by distinguishing characteristics and are not isolated events, because they were carried out for the same purpose.

150.    The predicate acts were committed in the same manner, and they constituted the Enterprise's "normal" way of doing business with regard to pursuing business transactions.

22

151.    The related predicates amount to a continued criminal activity because they extended over a substantial period of time.

152.    The Enterprise's course of action entails a span of months, during which Defendants committed numerous, related predicate acts, as set forth specifically herein, as part of its continuing scheme.

153.    Also, the predicate acts are closely intertwined as far as actors, goals, nature, functioning and structure of the operations described herein in the persecution of Plaintiffs.

154.    The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to or aided and abetted by unnamed co-conspirators and Defendants, as described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

155.    As a result of the Enterprise's conduct set forth herein, Plaintiffs have suffered injury in that they and or their predecessors, among other things: a) paid to the Defendants and other Members of the Enterprise fees, and other amounts for which they will receive no return , have and will continue to incur substantial additional costs in hiring legal advisors to rectify the situation, and suffered the loss of the $1.2 million purchase price contemplated by the LOI, as well as the loss of the Winn Dixie Property, and the ability to develop that property.

156.    As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded treble damages in accordance with the evidence, plus attorneys' fees and costs.


**SECOND CAUSE OF ACTION:**
**DECLARATORY JUDGMENT AND UNJUST ENRICHMENT**

**(Against all Defendants)**

157.     The allegations contained in paragraphs 1 through 156 of this Complaint are incorporated herein by reference.

158.     An actual, justiciable controversy exists between Plaintiffs on the one hand and the Defendants and other Members of the Enterprise on the other.

159.     Had the Plaintiffs not been pursued, solicited and enticed to enter into the financial transactions designed, created, engineered, implemented, marketed, and promoted by the Enterprise, Plaintiffs and or their predecessors would not have paid fees to AR, and invested in and/or continued to fund BS2LP and the development of the Winn Dixie Property during its bankruptcy.

160.     The payments made by Plaintiffs and/or their predecessors of fees to Defendants and other unnamed co-conspirators enriched Defendants and other unnamed co-conspirators and was to the detriment of Plaintiffs.

161.     Plaintiffs seeks a declaration that, due to the foregoing lack of consideration, the Enterprise has been unjustly enriched and all fees and other amounts paid to the Enterprise, including but not limited to fees and other amounts paid to Defendants, and amounts invested in BS2LP during its bankruptcy, should be returned to Plaintiffs.

162.     Plaintiffs also seek a judgment declaring each Defendants liable jointly and in solido with all unnamed co-conspirators for all damages sustained.

163.     Finally, Plaintiffs seeks an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

**THIRD CAUSE OF ACTION:**
**FRAUD**

**(Against all Defendants)**

164.     The allegations contained in paragraphs 1 through 163 of this Complaint are incorporated herein by reference.

165.     The Enterprise made false and misleading statements in violation of the law as set forth herein.

166.     The Enterprise made misrepresentations to the Plaintiffs herein for the purpose of inducing Plaintiffs and or their predecessors to participate in its schemes and to pay and/or contribute to the Enterprise sums of money, including amounts invested in BS2LP during its bankruptcy .

167.     In order to induce the Plaintiffs to pay its fees and other amounts, the Enterprise made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs and or their predecessors , including but not limited those acts and/or omissions set forth above.

168.     In addition, the members of the Enterprise, including but not limited to Ron Nakamoto made and/or were responsible for knowingly false misrepresentations to the Bankruptcy Court in order to induce the Court to approve the December Amended Plan substituting BSS for Storyville as the entity authorized to purchase the Winn Dixie Party.

169.     These knowingly false representations, included but were not necessarily limited to the following:

a.   that Storyville could not obtain financing from investors to purchase the Winn Dixie Property because investors refused to invest in Storyville in light of Ohle's criminal conviction and indirect involvement in Storyville.

b.   that Nakamoto was the sole member of BSS because investors had been unwilling to invest in Storyville because of John Ohle's criminal conviction.

170.    On information and belief, Nakamoto's representation to the Bankruptcy Court that CRI was ready, willing and able to provide the funding called for by the credit facility agreement was also a knowingly false representation.

171.    Prior to their receipt of the transcript of the December 22, 2010 hearing before the Bankruptcy Court, the Plaintiffs had never been informed by the Enterprise that Storyville could not obtain financing because of concerns about John Ohle's purported involvement in the Company, or that BSS was to be substituted for Storyville in the December Amended Plan.

172.    The above intentional omissions of material fact and/or affirmative representations made by the Enterprise and its unnamed co-conspirators were false when made and the Enterprise knew or should have known these representations to be false when made with the intention that the Bankruptcy Court and/or Plaintiffs rely on those representations.

173.    In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Enterprise with the intent to induce the Bankruptcy Court to approve the December Amended Plan.

174.    In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regarding the transactions at issue, the Bankruptcy Court approved the 6th Amended Plan, substituting BSS for Storyville as the entity authorized to purchase the Winn Dixie Property.

175.    After discovering the Enterprise's fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new legal advisors to rectify the situation.

176.    As a result of the Enterprise's conduct set forth herein, Plaintiffs have suffered injury in that they and or their predecessors, among other things: a) paid to the Defendants and other Members of the Enterprise fees, and other amounts for which they will receive no return, have and will

continue to incur substantial additional costs in hiring legal advisors to rectify the situation, and suffered the loss of the $1.2 million purchase price contemplated by the LOI, as well as the loss of the Winn Dixie Property and the ability to develop that property.

177.     As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## FOURTH CAUSE OF ACTION:
## CIVIL CONSPIRACY

### (Against all Defendants)

178.     The allegations contained in paragraphs 1 through 177 of this Complaint are incorporated herein by reference.

179.    As described more fully herein, the Enterprise and its Members, including Defendants, knowingly acted in concert in cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in violation of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

180.    The Enterprise and its Members, including Defendants acted as described herein according to a predetermined and commonly understood and accepted plan of action, all for the purposes of cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in violation of the LOI and Non-Circumvention Agreements, to obtain an

ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

181.    The acts of the Enterprise were contrary to numerous provisions of law, as stated herein.

182.    There was a meeting of the minds between and among Defendants and other Members of the Enterprise, both known and unknown, to commit the unlawful acts alleged herein.

183.    This conspiracy to commit these unlawful, overt acts proximately caused and continues to cause Plaintiffs damages as set forth herein.

184.    As a result of the conduct of Members of the Enterprise including Defendants, Plaintiffs suffered injury to their business and property in that they have paid to the Defendants and other Members of the Enterprise fees and other amounts , and have incurred actual damages and losses in an amount to be proven at trial; have incurred and will continue to incur substantial additional fees and costs in hiring legal advisors to rectify the situation; and have suffered the loss of the $1.2 million purchase price contemplated by the LOI, as well as the loss of the Winn Dixie Property and the ability to develop that property.

185.    As proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

## FIFTH CAUSE OF ACTION: LEGAL MALPRACTICE

### (Against the AR Defendants)

186.    The allegations contained in paragraphs 1 through 185 of this Complaint are incorporated herein by reference.

187.    AR Defendants acted as Plaintiffs' attorneys.

188.    The AR Defendants owed Plaintiffs a duty to represent them with such reasonable skill,

care and diligence as members of the legal profession commonly possess and exercise in similar situations.

189.    Throughout their engagements, the AR Defendants represented that they had a high level of experience in providing advice and that they were competent to perform all the necessary services for Plaintiffs and others in compliance with the applicable professional standards and the reasonable skill, care and diligence that members of the legal profession commonly possess and exercise in similar situations.

190.    At all times, Plaintiffs relied on the AR Defendants to perform all of their material obligations with the requisite skill, expertise and integrity that one would expect from such a prominent law firm.

191.    At all relevant times, the AR Defendants owed a duty to Plaintiffs to exercise due care while performing services and functioning as Plaintiffs' attorneys.

192.    At all relevant times, the AR Defendants owed a duty to Plaintiffs to operate without a conflict between the interests of Plaintiffs and other clients of AR and/or the AR Defendants' own pecuniary interests.

193.    At the very least, AR's conflicts should have been disclosed to the BS2LP Bankruptcy Court and Plaintiffs, and were not.

194.    The AR Defendants breached their duties to Plaintiffs by the conduct alleged hereinabove.

195.    Additionally, the AR Defendants failed to adopt or implement adequate controls to protect their clients from wrongdoing and negligence by AR personnel.

196.    The AR Defendants had a continuing duty to correct their past erroneous advice.

197.    The services the AR Defendants provided to Plaintiffs were deficient, inadequate and not

competent, and were not subject to the appropriate supervisory controls.

198.     The AR Defendants fell below the standard of care exercised by lawyers engaged to provide legal advice.

199.     Plaintiffs fully performed their obligations to the AR Defendants under their agreements with them.

200.     As a direct and proximate result of the AR Defendants' breach of their duties and professional negligence, Plaintiffs and or their predecessors have suffered and will continue to suffer substantial monetary damages, including but not limited to injuries to their business and property in that they have paid to the AR Defendants and other Members of the Enterprise legal fees and other amounts, including amount contributed to BS2LP and have incurred actual damages and losses in an amount to be proven at trial; have incurred and will continue to incur substantial additional fees and costs in hiring legal advisors to rectify the situation; and have suffered the loss of the $1.2 million purchase price contemplated by the LOI, as well as the loss of the Winn Dixie Property and the ability to develop that property.

### SIXTH CAUSE OF ACTION:
### BREACH OF CONTRACT, NEGLIGENT REPRESENTATION AND BREACH OF FIDUCIARY DUTY

### (Against the AR Defendants)

201.     The allegations contained in paragraphs I through 200 of this Complaint are incorporated herein by reference.

202.     On August 16, 2006, HR signed AR's Engagement Agreement for legal representation.

203.     Additionally, the AR Defendants were HR's fiduciary, and, as such, owed HR and its successors, including but not limited to the Royal Trust, the duties of honesty, loyalty, care and

compliance.

204.      The AR Defendants at all material times hereto also provided legal representation to the Royal Trust.

205.    The AR Defendants negligently represented Plaintiffs by participating in, allowing and or aiding the Enterprise in its scheme to cut the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

206.    The AR Defendants breached their fiduciary duties to Plaintiffs by participating in, allowing and/or aiding the Enterprise in its scheme to cut the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

207.   As a direct and proximate result of the AR Defendants' breach of their duties and professional negligence, Plaintiffs and or their predecessors have suffered and will continue to suffer substantial monetary damages, including but not limited to injuries to their business and property in that they have paid to the AR Defendants and other Members of the Enterprise legal fees and other amounts, including amount contributed to BS2LP and have incurred actual damages and losses in an amount to be proven at trial; have incurred and will continue to incur substantial additional fees and costs in hiring

legal advisors to rectify the situation; and have suffered the loss of the $1.2 million purchase contemplated by the LOI, as well as the loss of the Winn Dixie Property, and the ability to develop that property.

208.    As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence plus attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION:
## BREACH OF FIDUCIARY DUTY

### (Against Pelican and Nakamoto)

209.    The allegations contained in paragraphs 1 through 208 of this Complaint are incorporated herein by reference.

210.    As a member of San Fran LLC, Pelican, and its principals and officers, including Nakamoto, owed fiduciary duties to the Royal Trust including but not limited to the duties of honesty, loyalty, care and compliance.

211.    As a member of Storyville, Pelican, and its principals and officers, including Nakamoto, owed fiduciary duties to the Royal Trust including but not limited to the duties of honesty, loyalty, care and compliance.

212.    Pelican and Nakamoto breached their fiduciary duties to the Royal Trust by participating in, allowing and or aiding the Enterprise in its scheme to cut the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and

purchase and sale agreement it contemplated.

213.     As a direct and proximate result of the AR Defendants' breach of their duties and professional negligence, the Royal Trust has suffered and will continue to suffer substantial monetary damages, including but not limited to injuries to their business and property in that they have paid to the AR Defendants and other Members of the Enterprise legal fees and other amounts, including amount contributed to BS2LP and have incurred actual damages and losses in an amount to be proven at trial; have incurred and will continue to incur substantial additional fees and costs in hiring legal advisors to rectify the situation; and have suffered the loss of the  $1.2 million purchase price contemplated by the LOI, as well as the loss of  the Winn Dixie Property, and the ability to develop that property.

214.     As a proximate cause of the foregoing, the Royal Trust has been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence plus attorneys' fees and costs.

### EIGHTH CAUSE OF ACTION:
### BREACH  OF CONTRACT (Non-Circumvention Agreement)

#### (against Bradshaw, Kelso and Green Coast)

215.     The allegations contained in paragraphs 1 through 214 of this Complaint are incorporated herein by reference.

216.     The Green Coast Defendants owed the Plaintiffs a duty of good faith and fair dealing arising from the Non-Circumvention Agreement.

217.     In bad faith, the Green Coast Defendants materially breached the Non-Circumvention Agreement by violating its non-circumvention provision.

218.     Specifically, the Green Coast Defendants materially, and in bad faith, breached the Non-Circumvention Agreement by, among other things, among other things, cutting the Royal

Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

219. Plaintiffs fulfilled all of their contractual obligations under the Non-Circumvention Agreement and any and all conditions precedent to asserting these claims against the Green Coast Defendants.

220. As a direct and proximate result of the Green Coast Defendants' breach of the Non-Circumvention Agreement, the Plaintiffs have suffered and will continue to suffer substantial monetary damages, including but not limited to injuries to their business and property in that they have paid to the AR Defendants and other Members of the Enterprise legal fees and other amounts, including amounts contributed to BS2LP and have incurred actual damages and losses in an amount to be proven at trial; have incurred and will continue to incur substantial additional fees and costs in hiring legal advisors to rectify the situation; and have suffered the loss of the $1.2 million purchase price contemplated by the LOI, as well as the loss of the Winn Dixie Property and the ability to develop that property.

### NINTH CAUSE OF ACTION:
### BREACH OF CONTRACT (LOI)

### (Against Bradshaw, Kelso and Green Coast)

221. The allegations contained in paragraphs 1 through 220 of this Complaint are incorporated herein by reference.

222. The Green Coast Defendants owed the Plaintiffs a duty of good faith and fair dealing arising from the LOI.

223. The Green Coast Defendants materially, and in bad faith, breached the LOI by refusing to carry out its terms without justification, and instead conspiring against the Plaintiffs and Storyville .

224. Specifically, the Green Coast Defendants materially, and in bad faith, breached the LOI by, among other things, cutting the Royal Trust and Storyville from the Winn Dixie transaction, in order to obtain in excess of $547,000 in attorney fees for AR and to allow Kelso, Bradshaw and/or Green Coast or related parties, in breach of the LOI and Non-Circumvention Agreements, to obtain an ownership and development interest in the Winn Dixie Property, without paying $1.2 million to the Royal Trust pursuant to the LOI and purchase and sale agreement it contemplated.

225. Plaintiffs fulfilled all of their contractual obligations under the LOI and any and all conditions precedent to asserting these claims against the Green Coast Defendants.

226. As a direct and proximate result of the Green Coast Defendants' breach of the LOI, the Plaintiffs have suffered and will continue to suffer substantial monetary damages, including but not limited to injuries to their business and property in that they have paid to the AR Defendants and other Members of the Enterprise legal fees and other amounts, including amount contributed to BS2LP and have incurred actual damages and losses in an amount to be proven at trial; have incurred and will continue to incur substantial additional fees and costs in hiring legal advisors to rectify the situation; and have suffered the loss of the $1.2 million purchase price contemplated by the LOI, as well as the loss of the Winn Dixie Property and the ability to develop that property.

227. Plaintiffs hereby request trial by jury on all causes of action alleged herein.

**WHEREFORE**, Plaintiffs respectfully pray, that after all due proceedings, the Court enter judgment:

     (a) As to the RICO count, a judgment in favor of Plaintiffs and against each Defendant jointly and severally and in solido with all un-named co-conspirators, for actual damage in an amount to be proven at trial; plus treble damages, attorneys' fees, interest and costs;

     (b) Ordering restitution to Plaintiffs by Defendants of amounts paid to or on behalf of Defendants, including but not limited to fees, and funds contributed to BS2LP during its bankruptcy;

     (c) Ordering the Defendants to disgorge their fees and other amounts paid on their behalf, including but not limited to funds contributed to BS2LP during its bankruptcy;

     (d) Declaring that Defendants are liable to Plaintiffs for such damages that have been incurred because of the conspiracy set forth herein;

     (e) Awarding Plaintiffs all its damages on any counts herein in an amount to be proven at trial, including but not limited to punitive damages, consequential losses, interest, costs of suit, attorneys' fees and such other relief as the Court

may deem appropriate at law and in equity.

HR Properties of Delaware LLC and The
Royal Trust

By:

One of their Attorneys

Michael J. Kelly
John N. Walker
Waveland Law Group, LLC
55 West Wacker Street
Chicago, IL 60601
Tel:  312-456-7749
Firm ID No. 33046